EDWIN A. LOMBARD, Judge.
 

 hThe defendant, Ivan Green, appeals his convictions and sentences for manslaughter and attempted manslaughter. After review of the record in light of the applicable law and arguments of the parties, we affirm.
 

 Relevant Facts and Procedural History
 

 On December 29, 2007, Clayton Johnson, Jr., was shot and killed in the 2900 block of Mansfield Street in the Algiers section of New Orleans. At the time of his death, Mr. Johnson was sitting with his sister and Green’s wife, Katrice Johnson Green, in her car. When the police arrived, Green admitted shooting Mr. Johnson and at his wife’s car, but insisted the shots were fired in self-defense. The only gun found at the scene belonged to Green.
 

 On February 21, 2008, Green was charged by grand jury indictment with the second degree murder of his brother-in-law, Mr. Johnson, and the attempted second degree murder of Mrs. Green. He pleaded not guilty to both counts and, at the conclusion of his 5-day trial on January 24, 2009, was convicted by a twelve-person jury of the lesser charges of manslaughter and attempted manslaughter. Green was sentenced on November 6, 2009, to serve concurrent sentences of forty years at hard labor for manslaughter and fifteen years at hard labor for attempted manslaughter. He appeals both the convictions and sentences.
 

 |
 
 ¡Assignment of Error 1
 

 First, Green argues that the evidence is insufficient because the State failed to negate his claim beyond a reasonable doubt that the shootings were committed in self-defense.
 

 Pursuant to
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), we determine whether the evidence, viewed in the light most favorable to the prosecution, is sufficient to convince a rational trier of fact that all of the elements of the crime were proved beyond a reasonable doubt. Manslaughter is defined in La.Rev.Stat. 14:31(1) as a homicide which would be first degree or second degree murder, but “is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.” Provocation does not, however, reduce a homicide to manslaughter “if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed.” La. Rev.Stat. 14:31(1).
 

 A homicide is justifiable if “committed in self-defense by one who reasonably believes that he is in imminent danger of being killed or receiving great bodily harm and that the killing is necessary to save himself from that danger.” La. R.S. 14:20(1). When a defendant claims self-defense, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense.
 
 State v. Lynch,
 
 436 So.2d 567 (La.1983).
 

 The following evidence was adduced at trial.
 

 Green admitted to the police that he shot Mr. Johnson and at his wife’s car and the only gun found at the scene belonged to him. The autopsy revealed Mr. Johnson’s blood alcohol level was .162 and that, at the time of his death, he had marijuana in his system.
 

 IsFredriek Kron, an employee of Top Dollar Pawn Shop in Gretna, Louisiana, testified that on November 15, 2007, Green
 
 *719
 
 and his wife both pawned guns at his store and that on the day of the incident, December 29, 2007, Green redeemed his gun at approximately 3:20 p.m. Green did not appear to be intoxicated or upset when he redeemed the gun.
 

 Detective Ryan Aucoin testified that he investigated the shooting that occurred in the 2900 block of Mansfield. He detailed the evidence that was gathered from the scene by crime lab personnel, including photographs of Mrs. Green’s car (found at the corner of Mansfield and Gen. Meyer Avenue) that sustained a bullet hole on the driver’s side rear door and window, with the bullet lodging in the driver’s seat.
 

 Detective Mike McCleery testified that he was in charge of the murder investigation. In that capacity, he interviewed Green, Mrs. Green, Byron Allen, Raheim Allen, Orlando Hunt, and Gail Johnson, but not Mr. Johnson who died at the hospital before he had a chance to speak with him. Detective McCleery advised Green of his rights and Green indicated he understood his rights but waived them before giving a formal taped statement.
 

 Green’s taped statement was played for the jury and a transcript is part of the record. In it, Green admitted that he shot the victim who he referred to as “Junior.” On the day of the incident, Green got off work, had a few beers, took a nap, and was in charge of his children while his wife was at work. Green drove them to his mother-in-law’s house on Mansfield, near the scene of the shooting. He conceded he did not have a good relationship with Mr. Johnson stemming from past altercations that including his brother-in-law’s burglary of Green’s mother’s house on Mansfield where Green’s sister lived. Nevertheless, Green and Mr. Johnson |4often talked and drank beer together, as they did on the day of the incident. After a few beers, Green left Mr. Johnson and headed towards his sister’s residence. Mrs. Green arrived in the area but left after Green assured her the children were with him. Green was annoyed because he had watched the children all day. Green parked in his sister’s driveway, but Mr. Johnson asked him to go to the store to buy more beer. Green agreed to do so, leaving his children with Mr. Johnson. Mrs. Green returned, however, and became angry when Green he told her the children were with her brother, Mr. Johnson. Because his car would not start, Green headed back down the street to his mother-in-law’s house. Mr. Johnson was walking in the street with Green’s children, further angering Mrs. Green, so Green walked over to get the children. As he neared them, Mr. Johnson joined in the argument Green was having with Mrs. Green, calling him names and warning him not to mess with his sister (Mrs. Green). Green and Mr. Johnson argued and Mrs. Green told Green that he was going to have to deal with her and her brother (Mr. Johnson). Green exchanged further words with Mr. Johnson and, walking back towards his car, Green warned Mr. Johnson not to follow him. Mr. Johnson kept coming toward him, however, as Mrs. Green drove slowly toward him. Warning Mr. Johnson not to come near him, Green went to his car and retrieved his gun from the trunk. Mr. Johnson kept walking toward Green, motioning like he had something under his shirt. Then, according to Green, Mr. Johnson rushed at Green and, in response, Green fired once at Mr. Johnson. At that point, Mrs. Green tried to back her car over Green and Green fired at her car.
 

 Green claimed that Mr. Johnson had broken into Green’s mother’s house (where his sister lived) and that Mrs. Green was angry at him for refusing to drop the charges against Mr. Johnson. According to Green, Mr. Johnson had a February
 
 *720
 
 |ficourt date on the burglary charge and Mrs. Green had warned him not to go near Mr. Johnson because he had heard how Green had treated her while Mr. Johnson was in jail. Green claimed that Mrs. Green had twice pulled a gun on him, so they pawned their guns. A few weeks before the shooting, however, Green redeemed his gun after another altercation with Mrs. Green but soon pawned it again. Because Mrs. Green had threatened Green and encouraged others to threaten him as well, Green redeemed his gun on the afternoon of the shooting. Green insisted that Mrs. Green had a history of threatening, burning, and biting him and that he had twice reported her to the police. Because of the arguments, Green thought Mrs. Green had also redeemed her gun. In addition, a neighbor told Green that Mrs. Green had taken the keys out of his car while Green was inside his sister’s house.
 

 Green also related a prior instance where Mr. Johnson had pulled a gun and threatened him at a family gathering. Green grabbed a sword to defend himself. Mr. Johnson grabbed a bunch of knives and forks, stabbed Green, and then bit Green. The incident ended when Mr. Johnson ran out of the house with the gun. Mr. Johnson’s (and Mrs. Green’s) family convinced Green not to call the police because Mr. Johnson was under the influence of drugs and, accordingly, Green did not report this incident to the police.
 

 Sergeant Lawrence Gates testified that he was one of the first officers to arrive on the scene. He went to Mr. Johnson, who was unconscious and being held by his frantic mother, Green’s mother-in-law. She pointed to Green and told Sergeant Gates that Green shot her son. Green was standing nearby, holding onto a gun. Sergeant Gates drew his gun, pointed it at Green, and ordered him to drop the gun. Green did not comply immediately and Sergeant Gates repeated the order. | (¡Someone next to Green told him to drop the gun, hit his hand, and the gun fell to the ground. Sergeant Gates retrieved the gun, handcuffed Green, and put him in the back of his police car. EMS personnel were working on Mr. Johnson and Sergeant Gates saw no guns on Mr. Johnson or anyone else in the area. Sergeant Gates testified that Green admitted shooting Mr. Johnson, but insisted that he did not mean to kill him.
 

 Sandra Allen lived two houses from where the shooting occurred. She testified that just before the shooting, she was standing at the door and saw Mrs. Green drive up to Green. The two of them talked, with Green holding onto the car. Suddenly, Mrs. Green stepped on the gas and Green fell to the ground. Mrs. Green drove away and Green got up and went across the street to his sister’s house. Ms. Allen watched as Mrs. Green drove back, searched her husband’s car, took his keys, and left. At that point, Ms. Allen went inside her house. She testified that by the time she made it to her den, she heard a shot. When she went back outside, she saw Mr. Johnson lying in the street and Green standing across the street with a gun in his hand. She called 911. Ms. Allen testified that she did not see Mrs. Green but the Green children were standing next to the street, so she brought them inside her house. She continued watching until the police arrived and did not see anyone approach Green or take anything from him.
 

 On cross-examination, Ms. Allen elaborated on her testimony, stating that when Mrs. Green hit the gas, Green fell and flipped a few times on the ground. She explained that Green’s sister, Kimberly, and her husband, Orlando, were recent parents and lived across the street from her, while Mr. Johnson lived with his
 
 *721
 
 mother eight or nine houses down the block. She did not see Green arrive on the scene or Mrs. Green take keys out of the car parked in Green’s sister’s 17driveway. She heard only one shot and did not see anyone shoot at Mrs. Green’s car. Immediately after the shooting, Green stood on the sidewalk by his sister’s house and his children were sitting on the sidewalk across the street from where Green was standing. Mr. Johnson was lying in the street about two houses down.
 

 Mrs. Green testified that on the morning of the shooting, she was at work at an assisted living facility in Algiers when Green pulled into the parking lot with their two young daughters in the back of the car. The girls were not properly dressed for the weather and Green had been drinking. Green told Mrs. Green he would be at her mother’s house when she got off work and then left. After work Mrs. Green went to her mother’s house and saw Mr. Johnson (her brother) and Green sitting in the front yard, drinking and joking. She drove the Green to a store and they argued about her ex-husband and his ex-wife. She then dropped Green off at his mother’s house, where his sister was living.
 

 Mrs. Green then went home, took a shower, and changed clothes. Because Green still had not returned home with the children, she went back to her mother’s house. Green was gone, having left her daughters with her brother and his stepchildren. She left, but then decided to return and pick up her children. When Mrs. Green returned, her brother had taken her daughters to a store. She drove around looking for them and then returned to her mother’s house. Green was standing in the driveway of his sister’s house down the street and Mrs. Green drove there to argue with him about leaving their daughters with her brother. Green looked like he was going to come at her, so Mrs. Green started backing her car down the street to her mother’s house, rolled up the windows, and locked the doors. Green banged on the car and she left. As Mrs. Green was driving back towards her mother’s house, she saw Mr. Johnson walking down the street carrying Rone of her daughters and pushing the other in a stroller. She told Mr. Johnson to put the girls in her car or take them to their mother’s house because Green was acting strangely. At that moment, Green walked up, took their younger daughter out of Mr. Johnson’s arms and put her in his car. Mrs. Green drove slowly back to her mother’s house, talking with Mr. Johnson and heard Green, who was still near his car sitting in his sister’s driveway, state: “I’m gonna show you.” Mrs. Green looked in her rearview mirror and saw Green walking quickly toward them with a gun in his hand. She warned her brother that Green had a gun and Mr. Johnson turned around to face Green. Green walked up to Mr. Johnson and shot at him multiple times, hitting him with the third shot. Mrs. Green put her car in neutral, but Green began shooting at her, so she fled to her mother’s house. She told her mother, who had just arrived home, that Green shot her brother. Mrs. Green then ran back down the street, grabbed her girls, and took them to her uncle’s house. She called the police on the way to her uncle’s house and returned to the scene after the police left.
 

 Mrs. Green insisted that her brother was walking with her and had his back to Green before Green came up and shot him. Although she saw Green go to his car just prior to the shooting, she did not see him go into the trunk to get the gun. She did not remember her brother carrying anything under his shirt and she did not see him with a weapon. She insisted that the only thing that Mr. Johnson said to Green was to ask him what was going on. She
 
 *722
 
 denied putting her car in reverse to hit Green.
 

 Mrs. Green related that she and Green had been married for five years and had been together a few years before marriage. She described their relationship as abusive in that they fought and argued a lot, but admitted the fault was mutual. | nMrs. Green conceded that she had bitten Green once when he had her in a headlock and that she bought a gun not long after Green bought one. She also conceded that Green had called the police, accusing her of pulling a gun on him. She received a summons for this incident and, a few days later, they agreed to pawn their guns and did so at the store where they had purchased them. Mrs. Green did not redeem her gun and did not know that Green had redeemed his until she saw him shoot her brother and shoot at her.
 

 Mrs. Green admitted that her brother had been in jail, accused of breaking into Green’s family home, having been so accused by Kimberly and Orlando Hunt, Green’s sister and brother-in-law. The charges had been dropped prior to Mr. Johnson’s death, however. While Mr. Johnson was incarcerated, Green would get drunk and threaten to kill him but he always apologized for these remarks when he was sober.
 

 Mrs. Green recounted a prior incident involving a fight between Mr. Johnson and Green. They fought at her house and after Mr. Johnson went outside, Green grabbed a sword and chased him. She denied that her brother was armed at the time. She also described a prior incident during which she and Green were involved in a fight and Green grabbed a knife and tried to stab her in the forehead. In response, she threw a pot of hot beans at him. Green was arrested in connection with this incident. Mrs. Green denied ever hearing Mr. Johnson threaten Green.
 

 On cross-examination, Mrs. Green explained that she did not like to leave her children with Mr. Johnson for very long because he had problems staying focused. She stated that just prior to the shooting, Green took her daughter from Mr. Johnson and put her in his car and she did not remember her getting out of the car. She acknowledged that she took Green’s keys out of his car but insisted that |10he saw her do so. Mrs. Green maintained that she did not know why her husband shot her brother.
 

 On redirect, Mrs. Green explained that she took Green’s keys out of his car to keep him from driving because he was angry and intoxicated. She insisted that her brother had nothing in his hand and was walking away from Green when Green shot him. On re-cross, she stated that she was talking with her brother through the passenger window when she saw Green approaching in the rearview mirror. She screamed to her brother that Green had a gun, her brother turned, and Green shot him.
 

 Sandra Johnson Fiffee,
 
 [1]
 
 the mother of Mr. Johnson and Mrs. Green, testified that her son was twenty-two years old when he was killed. On the afternoon of the shooting, Mrs. Fiffee returned home sometime between 3:00 and 3:30 p.m. Soon thereafter, Mrs. Green came to her house and asked her to call 911 because she had been arguing with Green. Mrs. Fiffee refused, thinking that Green and her daughter had just had another argument. She testified that she had seen them near Green’s car when she first got home • and they appeared to be upset. When her daughter
 
 *723
 
 asked her to call the police, Green turned and walked back down the street.
 

 Shortly thereafter, Mrs. Fiffee heard what she thought were three firecrackers and Mrs. Green came to her house to report the shooting. Mrs. Fiffee called 911 as she ran down the street to the scene of the shooting and found her Mr. Johnson lying in the street. She saw green standing on the sidewalk, holding a gun. He pointed it at her but then held the gun down to his side. Mrs. Fiffee told | n Green that he should have shot her instead of her son and, at this point, Kimberly and Orlando Hunt attacked her, telling her that Mr. Johnson had robbed them and should not have been in the vicinity of their house. Raheim Allen, a neighbor, intervened.
 

 On cross-examination, Mrs. Fiffee denied doing anything to provoke the Hunts’ attack on her. She also denied taking anything from Mr. Johnson as he was lying in the street. She stated that she did not see Mr. Johnson with a gun at that time. She admitted that Mr. Johnson used marijuana and drank, but she did not know if he had used them that day. She also testified that Mr. Johnson was a slow learner.
 

 Byron Allen testified that he lived with his mother, Sandra, at the time of the shooting. He testified that, just prior to the shooting, he walked back from the store with Mr. Johnson and then went inside his mother’s house and did not come back outside until the police arrived after the shooting. He saw Mrs. Fiffee at the scene, but he did not see her trying to remove anything from Mr. Johnson. He saw Ms. Fiffee and others fighting on the scene.
 

 Raheim Allen, Byron’s brother, testified that he saw Green arguing with Mrs. Green before the shooting and that he saw Mrs. Green back up and knock down Green. After this, Green walked back down the street and Raheim went inside his house. He walked back outside and Green and Mr. Johnson arguing. Green set his daughter down in the grass near the street and Raheim picked up both girls and went to the Hunts’ house. He knocked twice and Orlando came to the door. He looked behind him, saw Mr. Johnson lying in the street, and called to his mother to call 911. He was outside when Mrs. Fiffee arrived and he did not see her remove anything from Mr. Johnson. Mrs. Fiffee and the Hunts became engaged in |12a fight and he broke it up. On cross-examination, Raheim Allen conceded he did not see the shooting because his back was to the street.
 

 In addition to these witnesses, the State presented the testimony of the firearms examiner, a 911 supervisor, and a crime lab technician who retrieved the gun used in the shooting.
 

 Green’s sister, Kimberly Hunt, testified on his behalf. She acknowledged living in her mother’s house across the street from the Allens and down the street from Mr. Johnson and Mrs. Fiffee. On the day of the shooting, Green came to her house to see her new baby, told her he had been in an argument, and said he was going home. Green did not appear to be intoxicated or angry when he left. Raheim Allen knocked at her door with Green’s daughter in his arms. She took the girl inside and then went outside with her husband, Orlando. Green was standing next to the street and his mother-in-law was running down the street. Mrs. Fiffee picked up her son and took from him a black object that looked like a gun. She told Mrs. Fiffee to put the object back and Mrs. Fiffee got up and asked if she wanted to shoot somebody. Mrs. Fiffee came at her and swung at her. Orlando jumped between them and pushed Mrs. Fiffee.
 
 *724
 
 While they were waiting for the police to arrive, Mrs. Hunt saw Mr. Johnson reaching toward Green and heard him say he was sorry. Green was still holding the gun at his side, and after the police arrived, he gave it to his cousin, who dropped it.
 

 On cross-examination, Mrs. Hunt conceded that she did not see the shooting. She was unsure if she told the police that she saw Mrs. Fiffee take something from Mr. Johnson prior to their arrival, but noted that the officers who investigated the shooting told her that they would contact her later to take her statement, but failed to do so.
 

 | is0rlando Hunt testified that on the day of the shooting, his brother-in-law (Green) came to see their new baby and told him that he had been arguing up the street with his wife (Mrs. Green) and brother-in-law (Mr. Johnson). Mr. Hunt saw Mrs. Green remove the keys from Green’s car and leave. He denied that Green was intoxicated or angry; rather, according to Mr. Hunt, Green just wanted to go home, but could not do so. Green went outside to check on his car and a minute later, Raheim Allen knocked on Mr. Hunt’s door and said that Mr. Johnson had been shot. Mr. Hunt went outside with his wife and saw Mr. Johnson lying on the ground with Green standing nearby. Mrs. Fiffee ran down the street and, picking up Mr. Johnson, removed a black object in his possession. At that point, Mrs. Hunt told Mrs. Fiffee to put the object back and Mrs. Fiffee tried to attack her. Mr. Hunt jumped between the two women and pushed Mrs. Fiffee away. Although the investigating officer told Mr. Hunt he would return to take his statement, he never did so.
 

 Green testified on his own behalf, admitting that he shot Mr. Johnson and at his wife’s car, but insisting that he did so in self-defense. Green related that on the day of the shooting, he was on the way to visit his sister (Mrs. Hunt) but when he passed the house of his mother-in-law (Mrs. Fiffee), he saw his brother-in-law (Mr. Johnson) standing outside. Green’s daughter went inside Mrs. Hunt’s house while Green went to speak with Mr. Johnson about the family conflicts. At the end of the conversation, Green and Mr. Johnson had resolved the family issues and Mr. Johnson left in a car while Green remained outside talking with the Allen brothers. When Mr. Johnson returned home, one of Green’s daughters asked to go to her grandmother’s house so he took the girls down to Mrs. Fiffee’s house and, while his daughters went inside, Green stayed outside with Mr. Johnson, talking and 114drinking beer. Mrs. Green drove up and asked Green what he was doing at her mother’s house. Green insisted that, although he had earlier driven to Mrs. Green’s place of employment, they had not spoken and Mrs. Green’s testimony concerning his visit was not true. Green conceded that conflicts existed between the families, but insisted that this animosity was no reason for him to fight with Mr. Johnson. Green tried to tell Mrs. Green that he and Mr. Johnson had resolved their differences, but Mrs. Green just walked off. Green agreed to go to the store to buy more beer for Mr. Johnson and drove Mr. Johnson and his daughters to the store and then back to Mrs. Fiffee’s house where he left Mr. Johnson and the children.
 

 Green knew Mrs. Green was going to return and, he admitted, drove to the pawn shop to redeem his gun. Green insisted that he was sober at the time and loaded the gun’s clip before he left the pawn shop. Green began to have car problems on the way back and, accordingly, parked his car in Mrs. Hunt’s driveway. He intended to
 
 *725
 
 ask Mr. Hunt to give him a ride to an auto parts store, but Mr. Hunt’s car was not working, so he decided to try to fix the car himself. When Mrs. Green pulled up asking where their daughters were, Green told her they were with Mr. Johnson. Green was leaning on Mrs. Green’s car as they talked so that when Mrs. Green pulled off, Green was dragged and then fell. Green got up and went inside Mrs. Hunt’s house. Green insisted that he did not know that Mrs. Green came back and took the keys from his car until Mr. Hunt told him.
 

 Green went outside and saw Mrs. Green driving down the street toward Mrs. Fif-fee’s house so he flagged her down and told her to return his keys. Mrs. Green told him to come and get the keys. Accordingly, Green walked down the street to get the keys from Mrs. Green but, instead, she got into her car. Green asked her |1fifor his keys and she rolled up the window. They argued and Mrs. Green drove off. Green walked back toward Mrs. Hunt’s house and saw Mr. Johnson walking down the street, carrying a child. Mrs. Green returned, drove up to Mr. Johnson, and told Mr. Johnson not to let Green take her daughters. Mr. Johnson approached Green and accused him of messing with Mrs. Green. They argued, Green began walking back to Mrs. Hunt’s house, and Mr. Johnson followed him. Because Mrs. Hunt had just had a baby, Green walked to his car in her driveway rather than going into her house. Mrs. Green returned in her car, called Mr. Johnson over, and drove off after speaking with him. Mr. Johnson put down the child he was carrying, took off his jacket, and walked aggressively toward Green. Green turned to walk back toward his car and someone called his name. Green looked up and saw Mr. Johnson, who told him that he was going to kill him. Green told Mr. Johnson not to follow him, but Mr. Johnson repeated his threat to kill him. Mr. Johnson, wearing an oversized shirt, put his hand under his shirt as if he were armed and repeated his threat. Green began to run and Mr. Johnson taunted him that he would catch him. Green stopped at his car and opened the trunk. He warned Mr. Johnson to stay away from him, but Mr. Johnson kept coming at him. Green grabbed the gun and shot Mr. Johnson one time. Green insisted that he did not intend to kill Mr. Johnson. Mr. Johnson fell and then told Green he was sorry. Green also shot at Mrs. Green’s car.
 

 Green related that Mr. Johnson often carried a gun and had pointed one at Green and Mrs. Green at Christmas in 2005 and, again, in July 2006. With respect to the 2006 incident, Green testified that they were at Mrs. Fiffee’s house and Mr. Johnson got mad at the family and drew a gun. The other family members ran inside and Mr. Johnson pointed the gun at him and fired, but the gun jammed. The |, fipolice were not called in connection with the incident. As for the 2005 incident, Green testified that Mr. Johnson was at Mrs. Fiffee’s house and became angry over the loss of some money. Mr. Johnson armed himself, grabbed his stepdaughter who he thought may have taken his money, and pointed the gun at her. Green stopped Mr. Johnson from going through the girl’s pockets and Mr. Johnson fled from the house, throwing Mrs. Green to the ground in the process. Green grabbed a sword and went after Mr. Johnson. When Green caught up with Mr. Johnson, he admitted that he had “done it again” and then ran off.
 

 According to Green, Mr. Johnson had a drug problem, frequently using marijuana and Ecstasy and stealing Mrs. Fiffee’s pain medication. Green also claimed that Mr. Johnson had mental problems and that he once took Mr. Johnson to Meadow-
 
 *726
 
 crest Hospital
 
 [2]
 
 for treatment to keep him from going to jail. Because of these prior incidents, on the day of the shooting Green believed that Mr. Johnson was going to kill him. Green reiterated that he did not intend to kill Mr. Johnson but that he was unpredictable, nice one minute and violent the next. According to Green, Mrs. Green’s family attempted to get him to drop the charges against Mr. Johnson in connection with the burglary of Mrs. Hunt’s home but he refused to do so because he thought Mr. Johnson would just do it again. Green conceded he did not know whether Mr. Johnson had a gun when he advanced towards Green, but insisted that Mr. Johnson put his hand under his shirt in a threatening manner. After Green shot Mr. Johnson, Mrs. Green backed her car directly at Green so he fired at her car. Mrs. Green ducked down as if looking for something and Green told her to leave.
 

 117On cross-examination, Green reiterated that Mr. Johnson had one hand under his shirt and was pointing his other at Green as he walked towards him. Although he bought Mr. Johnson two beers that day, Green insisted that this quantity was not enough to set Mr. Johnson off and maintained that Mr. Johnson first approached him that day to talk about the problems between the two families. Green corroborated Mrs. Green’s testimony that they pawned their guns after Green called the police when Mrs. Green pulled a gun on him. Green explained that he decided to redeem his gun on the day of the shooting because Mrs. Green had threatened him again. Green admitted that he was a little mad when he found out that Mrs. Green had taken his keys, but insisted that pulled his gun only because Mr. Johnson kept coming toward him and that he shot at Mrs. Green’s car because Mrs. Green was trying to back into him and grazed his leg. Green admitted telling the police that Mr. Hunt was outside at the time of the shooting, although Mr. Hunt denied being outside at that time. On redirect, Green admitted that he did not know for sure if Mr. Johnson had a gun and that he did not know if anyone removed Mr. Johnson’s gun from the scene. Green stated that he was on his own family’s property when he shot Mr. Johnson.
 

 The defense recalled Mrs. Fiffee, who admitted that she took Mr. Johnson to see a psychiatrist many times. Mrs. Fiffee testified Mr. Johnson was diagnosed as paranoid and was prescribed Seroquel, but that he did not always take his prescribed medication. She admitted that Mr. Johnson had been hospitalized for mental problems at three different hospitals and had visited the psychiatrist within the three week period preceding his death. Mrs. Fiffee knew that Mr. Johnson used marijuana and hung around with people who took Ecstasy, so she figured he took that as well. In addition, Mr. Johnson took some of her Oxycontin. Mrs. Fiffee 11Rdenied any knowledge of the 2005 Christmas episode but testified that the 2006 incident, wherein Mr. Johnson threatened to beat Mrs. Fiffee’s ex-husband, resulted in one of Mr. Johnson’ hospitalizations. Mrs. Fiffee admitted that Green’s sister, Mrs. Hunt, dated Mr. Johnson while they were in high school.
 

 On cross-examination, Mrs. Fiffee testified that the 2006 incident occurred when her ex-husband beat up Mr. Johnson and, in retaliation, Mr. Johnson pulled a gun on him. The police were called and, although they did not arrest Mr. Johnson (who had
 
 *727
 
 gotten rid of his gun before they arrived), they told her Mr. Johnson needed help. Accordingly, Mrs. Fiffee obtained commitment papers from the coroner’s office and the police took Mr. Johnson to the hospital. Mrs. Fiffee insisted that Mr. Johnson threw away his gun after the 2006 incident. Mrs. Fiffee conceded, however, that she committed Mr. Johnson after that incident because her ex-husband would not let Mr. Johnson return to the house unless he got some help.
 

 On rebuttal, the State recalled Detective Aucoin, who testified that Green did not say anything about being injured. He also testified that Mr. Hunt did not mention that Mrs. Hunt was attacked by Mrs. Fif-fee. Detective Aucoin stated that no other crimes were reported in connection with the shooting. He admitted that he did not examine Green and was not present when any other officer asked Green whether he was injured.
 

 The State also recalled Detective McCleery who testified that he spoke with Mr. and Mrs. Hunt a few weeks after the murder and neither mentioned that Mrs. Hunt had been attacked. Moreover, Detective McCleery did not receive any information about anything being removed from Mr. Johnson’s body. He denied telling either Mr. or Mrs. Hunt that he would return to take them statement, noting that they both told him that they were inside at the time of the shooting and did not 113see it. Detective McCleery testified that he took taped statements from the Green and Mrs. Green because Green was under arrest for the shooting and Mrs. Green was an eyewitness but he did not take taped statements from Mr. and Mrs. Hunt because they told him they did not see the shooting.
 

 Viewing this evidence in the light most favorable to the prosecution, we find there is sufficient evidence to support Green’s convictions. The only evidence related to Mr. Johnson’s purported threatening behavior is Green’s testimony. Mrs. Green contradicted Green’s claims that Mr. Johnson’s actions were threatening or that Mr. Johnson had threatened Green with a gun in a prior incident. Mrs. Green testified that Mr. Johnson only asked Green “what was going on” and that she and Mr. Johnson returning to Mrs. Fiffee’s house when Mrs. Green looked in the rear-view mirror and saw Green approaching them with a gun. Mrs. Green testified that Mr. Johnson turned at her warning and Green shot him. Similarly, with regard to shooting at Mrs. Green’s car, the only testimony supporting Green’s claim of self-defense is that of Green. Raheim Allen testified that it appeared to him that Mrs. Green backed up her car into Green and knocked him down, but according to Mr. Allen, this occurred earlier in the afternoon and did not immediately precede the shooting. Moreover, Mr. Allen did not see the shooting and Mrs. Green denied that she tried to back into Green.
 

 Thus, the jury apparently believed Mrs. Green’s testimony over that of Green. It is axiomatic that a fact finder’s credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence.
 
 See, e.g., State v. Johnson,
 
 2009-0259 (La.App. 4 Cir. 9/16/09), 22 So.3d 205,
 
 writ denied,
 
 2009-2263 (La.4/16/10), 31 So.3d 1054. In this case, the jury’s finding is not contrary to the evidence and this assignment of error is without merit.
 

 12nAssignment of Error 2
 

 By his second assignment of error, Green contends that the trial court erred by imposing sentence without allowing him an opportunity to present any mitigating evidence or make any formal argument.
 

 A reading of the transcript of the initial sentencing hearing held on September 11,
 
 *728
 
 2010, hearing indicates that defense counsel was given the opportunity to present any evidence in mitigation. At that hearing, after Mrs. Fiffee testified, Green testified in his own behalf. Green reiterated his trial testimony as to the shooting and as to Mr. Johnson’s mental condition and propensity toward violence. The court cut off further testimony that merely mirrored what the defense presented at trial. Further, the court observed that Green’s testimony at the hearing showed Green had no remorse for the shootings. Defense counsel moved to recuse the court and the court denied the motion. Counsel then moved for time to take a writ and the court reset sentencing. Counsel did not file a writ on the recusal issue.
 

 Contrary to Green’s assertion, the transcript of the November 9, 2008, sentencing shows that defense counsel was afforded an opportunity at that hearing to present any evidence or argument but he indicated he had nothing else to say. At the beginning of the hearing, defense counsel noted that at the previous sentencing hearing, the court heard testimony from Mrs. Fif-fee and from Green. Defense counsel noted that he then moved to recuse the court, and the court denied the motion. Defense counsel then stated: “So, we’re here. I have nothing further to say.” The court then summarized the contents of the pre-sentence investigation report and the trial testimony. The court set forth the sentencing range for each conviction, and at that point, defense counsel objected, indicating he wanted to | Mmake a statement. The court refused to allow defense counsel to interrupt and continued its extensive reasons for the sentence it then imposed. Defense counsel objected, noting that he was not “finished” with the sentencing hearing. The court responded by asking if counsel had prepared a motion for appeal. Counsel stated that he did not intend to file one until he had a sentencing hearing and a chance to argue on his client’s behalf. The court took a brief recess.
 

 When court reconvened, defense counsel asserted that he had the right to argue to the court as to the appropriate sentences to be imposed. The court rejected this argument, noting that prior to summarizing the presentence report, he asked either side if it had anything else to present, and defense counsel stated that he did not have anything to submit. The court asked if counsel had any argument at that point as to a motion to reconsider sentence, and counsel declined to do so, asserting that he had been denied the right to argue. Defense counsel then accused the court of misstating the facts of the case and attempted to reiterate Green’s testimony. Defense counsel apparently became quite agitated, as the court asked him to quit yelling and pointing his finger. Defense counsel continued his summary of Green’s version of events and raised again a pretrial ruling concerning evidence of Mr. Johnson’s mental condition. The court finally advised counsel to make any further arguments in this vein on appeal and counsel stated: “I did not expect to get a fair hearing from this court.” The court declined to hear any further argument from defense counsel, indicating that it had heard enough of counsel’s insults.
 

 Accordingly, a reading of the transcripts indicates that defense counsel was afforded the opportunity to present evidence and make argument prior to the court’s imposition of sentence and, indeed, that he called Green to the stand at the |22first hearing. Defense counsel explicitly indicated to the court at the second hearing that he had nothing else to say. After counsel objected that he was not afforded a chance to argue as to the length of the sentences, the court gave him the opportunity to argue as to a motion to reconsider sentence, but counsel refused to do so. Thus, at the
 
 *729
 
 first hearing, defense counsel was presented with and took the opportunity to present mitigating evidence. After the court imposed sentence at the second hearing, he was presented with the opportunity to make any argument for reconsideration of sentence. He chose not to do so. Therefore, counsel was not denied the opportunity to be heard, either before or after sentence was imposed, and this assignment of error has no merit.
 

 Assignment of Error 3
 

 By this assignment of error, Green contends that the trial court erred by instructing the jury that it could return a less than unanimous verdict to convict. If the court so charged the jury, this claim was not preserved for appeal as the transcript of the last day of trial indicates that there were no objections to the court’s instructions to the jury.
 
 See
 
 La.Code Crim. Proc. art. 801 (“A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error.”). In addition, the record is silent as to whether the jury’s verdict was not unanimous; neither the trial transcript nor the minute entry of that day of trial indicates the number of jurors who voted to convict the appellant. Moreover, even if the issue had been preserved, it has no merit. Pursuant to La.Code Crim. Proc. art. 782, a non-unanimous jury of ten to two is allowed in non-capital felony cases.
 
 See State v. Bertrand,
 
 2008-2215 (La.3/17/09), 6 So.3d 738 (finding this issue has no merit).
 

 |
 
 ??,Pro Se Assignment of Error
 

 By his sole
 
 pro se
 
 assignment of error, Green contends that his due process and equal protection rights have been violated by assertions made in the State’s brief. Specifically, Green notes that the State erroneously asserts that Green shot at Mr. Johnson multiple times, while Green’s testimony and that of others show that Green shot only once at Mr. Johnson. Green also points to the State’s assertion that Green had several beers prior to the shootings, while Green’s testimony shows that Green drank only one beer before the shooting.
 

 With respect to the number of beers Green consumed prior to the shooting, in his statement given to the police on the evening of the shooting Green admitted that he had a few beers when he got off of work that morning; both Green and Mrs. Green testified that he was drinking with Mr. Johnson when Mrs. Green arrived at Mrs. Fiffee’s house that afternoon; and Green admitted that he went to the store to get more beer for Mr. Johnson. Thus, the State’s mention of several beers is its interpretation of the evidence introduced at trial.
 

 Moreover, Green fails to show how these purported inaccuracies deprived him of his due process and equal protection rights. There is no indication, nor does Green allege, that the State presented either of these “false” statements to the jury; Green argues only about their inclusion in the State’s brief before this court, and the State’s allegation of the number of beers Green consumed or the number of times Green shot at Mr. Johnson and Mrs. Green is merely its interpretation of the evidence adduced at trial. This court has the benefit of the trial transcript and Green’s statement that was presented to the jury and upon which the jury based its verdicts and, accordingly, the State’s second-hand interpretation of the evidence |?4has no bearing on this court’s determination of the merits of the appeal. This assignment of error is without merit.
 

 
 *730
 

 Error Patent Review
 

 Finally, a review for errors patent reveals no error.
 

 Conclusion
 

 Green’s convictions and sentences are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . Ms. Fiffee's name was spelled several different ways in the various transcripts in this record, but she spelled her last name Fiffee during a sentencing hearing.
 

 [2]
 

 . At this point, the jury viewed Johnson’s medical records, including records from the Louisiana Department of Human Services and Ochsner/Meadowcrest, as well as Physician Emergency Certificates.